BRUNSWICK–BALKE–COLLENDER CO. v. CHARLES PASSOW & SONS.

(District Court, W. D. Missouri. July 25, 1913.)

No. 3,480.

PATENTS (§ 328*)—INVENTION—POOL TABLES.

The Cunningham patents, Nos. 553,185 and 559,790, each for improvements in billiard or pool table pockets, and No. 556,532, for improvement in return conduits for balls, connected with the pockets of such tables, are each void for lack of patentable invention.

In Equity. Suit by the Brunswick-Balke-Collender Company against Charles Passow & Sons, a corporation. On final hearing. Decree for defendant.

F. V. Kander, of Kansas City, Mo., and Philipp, Sawyer, Rice & Kennedy, of New York City, for complainant.

John H. Whipple, of Chicago, Ill., for defendant.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

VAN VALKENBURGH, District Judge. Complainant, organized under the laws of the state of Delaware, and the owner of letters patent Nos. 553,185, 556,532, and 559,790, as assignor of the inventor, Patrick M. Cunningham, brings its bill of complaint against Charles Passow & Sons, a corporation organized under the laws of the state of Illinois, and doing business in Kansas City, Jackson county, Mo. It charges said defendant with infringement of these patents, and prays injunction, accounting, and damages. The defendant moves the court to dismiss the bill for want of equity on the alleged ground that complainant has failed to prove infringement after complainant acquired title to the patents in suit. It also asserts that said patents are void for want of novelty and invention, and denies infringement.

The motion to dismiss must be denied. A stipulation on file admits that:

"The complainant acquired title to the patents in suit and all claims and demands, both at law and in equity, for damages and profits accrued or to accrue on account of the infringement of said letters patent, or any of them, as alleged in the bill of complaint, by virtue of an assignment dated March 30, 1908, from the Brunswick-Balke-Collender Company, of Ohio, to complainant, which assignment was duly recorded in the Patent Office April 10, 1908."

The bill in this case was filed March 30, 1909. The defendant was incorporated July 16, 1904. It is stipulated that the defendant sold a pool table embodying the alleged infringing devices at Kansas City, in this district, prior to the commencement of this suit. It sufficiently appears, therefore, that the sale was made after July 16, 1904, and within six years prior to the filing of the bill; also that complainant then had title to all claims and demands for damages and profits on account of infringements committed prior to the date of the assignment, and within the statutory period antedating the filing of the bill; that the assignment to complainant expressly transferred such rights of action to the assignee.

The patents are susceptible of conjoint use, as will hereafter more clearly appear. Defendant objects to certain testimony and evidence tendered by complainant, and asks that the same be excluded. In the view I take of this case, however, it will be unnecessary to determine this and other questions raised, and we may pass at once to a consideration of the validity of the patents.

The first patent in suit, No. 553,185, relates to pool tables which are provided with pockets and with a device for conducting the balls from the pockets to a large pouch or pocket at the foot of the table without necessitating the removal and collection of said balls by the players or by an attendant. This device, which was originally one embodying marked invention and a distinct advance in the art, was concededly old. The object of this patent is thus stated in the specification:

"I propose to provide for use metallic ball receptacles for pool tables, which not only will not impair the exterior appearance and design of the table, but which, furthermore, shall be capable of securement to the woodwork of the table without any exposure to sight of the means of securement, and shall possess the capacity to fit equally well to tables of various shapes or designs of body. To this main end and object my invention may be said to consist in a metallic ball receptacle for billiard or pool tables adapted to extend

inwardly from the locality at which the pocketed ball is received in said receptacle, and to be fastened to the woodwork of the table without fitting to the exterior surface of the table body."

In other words, having given in the prior art pool tables with metallic pockets attached at the corners and sides of the table and outwardly visible, also a device in such tables for conducting the balls from such pockets to a common receptacle, which said device must of necessity have connected with said pockets, the patentee undertakes to conceal such pockets within the structure of the table, so that they may not detract from its otherwise attractive appearance. Passing by the question raised of whether such an improvement must not be limited to a specific construction, it becomes pertinent to inquire whether the mechanical expedient of inclosing the pockets within the structure of the table, thereby partly or wholly concealing them from sight, can be called invention? So far as appears from this record, this so-called invention involved no more ingenuity than might be expected of any competent workman engaged in the manufacture of tables of this character and possessed of the necessary skill which might reasonably be expected of him to adapt his construction to mere change in location of parts. I do not think the essential elements of patentability are here present.

The third patent in suit, No. 559,790, also concerns the pockets of such a billiard or pool table. These two patents were pending in the Patent Office at the same time, the former being granted January 14, 1896, and the latter May 5, 1896. This specification advises us that a construction used almost wholly up to the present time—

"is that in which metallic gutter irons of approximately hemispherical form are secured to the exterior of the table body, so as to form cup-shaped extensions outwardly of the conduits, and in which the usual pocket netting which depends from the ordinary 'pocket iron' has its lower edge securely fastened to the upper semicircular edge of said gutter iron, all in a manner well understood by those familiar with the manufacture and use of pool tables. This last-mentioned and almost universally employed construction, while it is comparatively strong and durable (the metallic gutter irons being usually able to bear the strain and shocks of forcibly holed balls), is objectionable in some particulars, chief among which are, first, that of a great liability of injury to the ivory balls by contact with the upper edge of the gutter iron; second, that of a liability of a forcibly holed ball to rebound or jump back onto the table; and, third, that of a tendency of the hard knocks and jars to which the gutter iron is subjected to loosen the connections between the gutter iron and the table body."

To remedy these objectionable features is stated to be the main end and object of the invention. It consists of a curved and gutter-shaped leather shoe inserted in the pocket and communicating with the conduits for assembling the balls heretofore referred to. In other words, it is a leather lining and cover for the pocket and gutter iron theretofore existing, so shaped as to conform itself, for a brief space, to the conduit communicating with the pocket. It also, in some cases, supplied the place of the familiar pocket netting depending from the pocket iron. It seeks to obviate the chipping of the balls by contact with the iron and the liability of a forcibly holed ball to rebound upon the table, by covering the iron with the softer and more yielding

leather material. The cup and trough shape into which the latter is molded is dictated largely by that of the parts to which it is applied, developed, perhaps, by requirements perfectly obvious to the unskilled, and susceptible of ready construction by the skilled, workman. In the patent to Jefferson, dated March 29, 1891, a cruder device having the same general character and objective is shown. This device, of necessity, conformed in some degree to the shape of the pocket and gutter in which it was placed. In any event, I do not think the mere molding of the Cunningham device into the shape shown in the patent in suit involved invention; nor do I think it requires inventive genius to perceive the desirability of covering the hard pocket and gutter irons with leather or other softer substance to prevent injury to balls and to remedy the other obvious inherent defects named.

The second patent in suit, No. 556,532—

"relates to the conduits or ball troughs of that species of pool table in which the balls holed descend through bottomless pockets into the upper end portions of downwardly inclined wooden conduits or troughs, by which they are conducted to a receptable located beneath the bed of the table at the foot of the latter in a manner and for the purposes well known to the makers and users of this kind of pool tables. Previous to my invention this conduit has been made in the form of a rectangular trough with an oblong opening in its bottom, and lined with cloth to prevent much of the noise or racket that would otherwise be made by the tumbling about and rolling along of the balls within the troughs. Such conduits or ball troughs have, however, been found to be defective or objectionable in practice mainly in these particulars, viz.: First, that considerable noise is made by the passage of the balls through them; and, second, the cloth linings very soon wear out or get worn into such a condition that they require repairing, which involves considerable trouble and expense. I propose by an improvement to provide for use a ball conduit which, while it will be less expensive of manufacture to start with than the cloth-lined troughs, will be more noiseless and more durable than any heretofore made that I know of. To these main ends and objects my invention consists in a ball conduit or conductor provided with two ways composed of strips of vulcanized rubber or other suitable comparatively soft, but durable, material, the wooden portion of the conduit being so made and the said ways so combined therewith that the ball will travel wholly on the angular parts of the said noiseless ways and out of contact with the wooden surfaces of the trough."

The original claims tendered were the following:

"First. A ball conduit, for pool tables comprised of a trough-like device, having, as usual, a bottom opening for the escape of chalk, and provided with parallel ways, or skids, on which the balls travel wholly in their passage from the pockets to the receptacle for holed balls, substantially as hereinbefore set forth.

"Second. A conduit for pool tables composed of an open bottomed trough; and two parallel ways c, c, of soft rubber, or other suitably noiseless material, the whole constructed and operating so that the balls passing through the conduit travel wholly on said noiseless ways, all substantially in the manner and for the purpose set forth."

Presumably because of rejection this substitute was proposed:

"In a ball trough, or conduit, for pool tables, the combination, with the trough-like device, having, as usual, a bottom opening for the escape of chalk, of the ways c, c, of some suitable soft and noiseless material, arranged so that the ball must travel on the angular portions, or edges thereof, in the manner and for the purposes set forth."

Although the file wrapper exhibited does not disclose the views of the examiner, this substitute must have proved unsatisfactory, because a second substitution was made, which embodied the two final claims of this patent. They read as follows:

"(1) The wooden ball trough for pool tables, provided with rabbets, e, and with strips, C, C, of elastic material, such as is described, secured in the rabbets so that the ball will travel only on their upper and inner edges, as and for the purpose set forth.

"(2) The wooden ball trough for pool tables, comprising the pieces, A, A, and, b, b, provided with rabbets, e, in the pieces, A, A, and with the strips, C, C, of elastic material, such as is described, secured in the rabbets so that the ball will travel along their upper and inner edges, as and for the purpose set forth."

Now, it will be observed that the idea of the invention was to escape the noise produced by the rolling along of the balls within troughs lined with cloth, which was not entirely satisfactory as a noise absorber and which soon wore out. For this was substituted parallel ways or skids on which the balls "travel wholly"; these ways being of soft rubber or other suitably noiseless material. The next step in the first substitute was to prescribe ways of some suitable soft and noiseless material, arranged so that the ball must travel on the angular portions or edges thereof. The final claims differ only in that they specify rabbets in which the strips or ways of elastic material are set, the ball traveling as before on their upper and inner edges.

The use of skids or ways upon which spherical bodies may be rolled is old in all arts to which such a use is pertinent. Furthermore, the Augustin patent, No. 472,423, granted April 5, 1892, discloses a track with parallel skids or ways upon which the balls roll. This track was covered with leather or other so-called suitable material. In the Goss patent, No. 507,900, granted October 31, 1893, the conduit was composed of several parallel wires or rods covered with soft rubber to prevent injuring the balls and to deaden the noise. It is plain that the use of ways or skids was obvious as well as old, and the substitution of rubber as a material could scarcely involve invention. Under these conditions the patentee apparently was compelled to narrow his invention to the employment of rabbets in which these rubber strips were set. The rabbet is an old and well-known form of construction within which to anchor some other element to add steadiness. Its employment in this structure required no exercise of the inventive faculties, nor did the resulting combination.

It is contended that the requirement that the ball should travel upon the inner and upper—that is to say, the angular—edges of the strips, was novel; but if a sphere be made to travel upon ways of any description placed far enough apart so as to retain that sphere wholly upon them, it will be seen that no other result is possible. A portion of the ball will inevitably sink below the angular corner and the movement will be along those corners. This is equally true of all other ways or skids that have been used. Rubber is, of course, more noiseless than cloth or leather, but that is a matter of common knowledge. It is now also urged that the speed of the ball is thus retarded. The inventor apparently had no conception of this, for he does not mention

it. From any point of view I am unable to discover either novelty or invention in the claims of this patent in suit.

For the sake of completeness it may be well to add that, if complainant's devices were patentable, defendant's structure is a plain infringement, but from the preceding discussion this consideration becomes immaterial. As was said at the outset, the device for conducting the balls from the pockets beneath the table to a common receptacle was a valuable improvement, involving novelty and invention; but that device is not presented by the patents in suit. We have here only the gradual and obvious betterments involving only such incidental improvements as would naturally suggest themselves to the skilled mechanic or workman in the manufacture of pool tables having the prior art before him.

In Brunswick-Balke-Collender Co. v. Wagner & Adler Co. (C. C.) 155 Fed. 120, these same patents were before Judge Platt of the Southern district of New York. His decision was based upon different references and a distinct alleged infringing device. He found for the defendant, partly upon the ground of lack of invention and partly upon that of noninfringement. Nevertheless, his conclusions as to the patents involved coincide practically with those herein expressed. I am aware that Judge Morris, in the district of Maryland, entertained a contrary view; nevertheless, each case must be decided upon the record as presented and upon the independent judgment of the chancellor.

It follows that the bill cannot be maintained as to any of the patents in suit, and must be dismissed.